UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KARIFF CARROLL,

      Plaintiff,

v.                                        Case No.  8:11-cv-1063-T-24 TGW

CERIDIAN BENEFITS SERVICES,

      Defendant.

_____/

**ORDER**

      This cause comes before the Court on Defendant's Motion for Summary Judgment.
(Doc. No. 17).  Plaintiff opposes the motion.  (Doc. No. 23).  The Court ordered the parties to
file a reply brief and sur-reply brief, which they filed.  (Doc. No. 26, 27, 29).  As explained
below, Defendant's motion is granted.

**I.  Standard of Review**

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The Court must draw all inferences from the evidence in the light most favorable to the
non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d
1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of
showing the Court, by reference to materials on file, that there are no genuine issues of material
fact that should be decided at trial.  See id. (citation omitted).  When a moving party has
discharged its burden, the non-moving party must then go beyond the pleadings, and by its own
affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiff Kariff Carroll, an African-American male, was hired by Defendant Ceridian

Benefits Services on April 28, 2008 as a major accounts representative ("MAR").  (Pla. depo. p.

98).  As a MAR, Plaintiff sold benefit administration solutions to employers in several states.

(Pla. depo. p. 60).  Plaintiff was paid a base salary, plus commissions.  (Pla. depo. p. 91-93).

After he was hired, Plaintiff went through a one-week sales boot camp training.  (Pla.

depo. p. 73-74).  Thereafter, Plaintiff started a 90-day sales training curriculum.  (Doc. No. 75).

During that time, Plaintiff was assigned a sales coach, Michael Edwards.  (Pla. depo. p. 76).

Edwards was a MAR, and he was someone that Plaintiff could go to if he had any questions

about his job.  (Pla. depo. p. 88).

In August, after the 90-day training curriculum, Plaintiff started selling Defendant's

products. However, the main buying season for Defendant's products is March through

August/September, so by the time Plaintiff started selling Defendant's products, a lot of potential

buyers had already made their purchasing decisions.  (Pla. depo. p. 89-90, 189).  As a result,

Plaintiff's sales to new customers in 2008 was only $5,449.10, which was 1.04% of his prorated

sales quota.[1]  (Pla. depo. p. 98-99, 110-11, 184; Pla. depo. Ex. 116).

At the end of 2008, there were five other MARs, all of whom were white: Mark Sloggy,

Jim Robinson, Michael Edwards, Christine Christou, and Mike Moran.  (Pla. depo. p. 111).

Sloggy, Robinson, and Edwards had $1 million sales quotas for 2008.  Sloggy made sales

---

[1]Plaintiff's $1 million quota for sales to new customers was prorated because he was
hired mid-year.  (Pla. depo. p. 110).  Plaintiff also made a renewal sale in 2008 of over $144,000.
(Pla. depo. p. 99-100).

totaling over 100% of his sales quota; Robinson made sales totaling between 24% and 34% of his sales quota; and Edwards made sales totaling about 7% of his sales quota.  (Pla. depo. p. 112-13).  Both Christou and Moran were hired at the end of 2008, so they did not have a sales quota for 2008.  (Pla. depo. p. 112).

In the beginning of 2009, two additional white MARs were added to the group—Bill Boutwell and Marianne Ardvison.  (Pla. depo. p. 116).  Thus, there were a total of eight MARs (including Plaintiff) at the beginning of 2009.  On January 14, 2009, Plaintiff's supervisor, David Whigham, sent the eight MARs an email stating that their team sales quota was $4.9 million. (Pla. depo. p. 118).

On January 13, 2009, Whigham told Plaintiff that Plaintiff would be sharing his sales territory with Edwards.  (Pla. depo. p. 100, 161).  Plaintiff felt that Whigham's decision to split his sales territory was racially motivated, so he immediately made a complaint to Faye Huminski and Darlene Harris in Human Resources.  (Pla. depo. p. 242; Doc. No. 29-1).

Plaintiff believed that Whigham's decision to split his sales territory was racially motivated for several reasons.  First, Edwards, the white MAR with whom Plaintiff had to share his sales territory, was given the higher grossing products to sell.  (Pla. depo. p. 190, 274-76). Second, Plaintiff contends that Whigham made racist comments to him, such as patting him on the head and calling Plaintiff his boy in November of 2008.  (Pla. depo. p. 230, 234-35).  That same day in November of 2008, Whigham had a conversation with Plaintiff about Tupac Shakur, wherein Whigham suggested that Tupac Shakur's life was a tragedy, and Plaintiff found this conversation to be strange and uncomfortable.[2]  (Pla. depo. p. 230-33).  Whigham also had

---

[2]Tupac Shakur is an iconic African American rap artist.  (Pla. depo. p. 233).

conversations with Plaintiff about affirmative action and stated that African American people needed affirmative action or else they would have no hope.  (Pla. depo. p. 231-32).  As a result, Plaintiff believed that "Whigham's actions in combination suggest the mindset of a racist."  (Pla. depo. p. 233, 234).

Whigham, on the other hand, gave two reasons why he decided to have Plaintiff share his sales territory with Edwards: (1) Defendant needed to have someone else beginning to become familiar with Plaintiff's sales territory, because Plaintiff was underperforming; and (2) Edwards was put in Plaintiff's sales territory to help Plaintiff, because Edwards had been with Defendant for ten years and was one of the MARs with the most knowledge and experience.  (Whigham depo. p. 19).  Whigham further stated that "having [Plaintiff] go on some calls with [Edwards] would let [Plaintiff] see somebody who understood the products very deeply and would be a way to help [Plaintiff] perform hopefully."  (Whigham depo. p. 19).  Thus, according to Whigham, "the primary reason for putting Mr. Edwards in [Plaintiff's] territory was to help [Plaintiff]."  (Whigham depo. p. 28).

In March of 2009, Plaintiff states that he was ranked third among the eight MARs for new sales, reaching 16% of his sales quota while he shared his sales territory with Edwards.  (Pla. depo. p. 119-21, 280-81).  Also in March of 2009, his complaint to Human Resources about the sales territory split led to a redistribution of the sales territories, and Plaintiff no longer had to share his sales territory with Edwards.[3]  (Pla. depo. p. 192, 274-75; Pla. depo. Ex. 28, 29).  However, at the same time, on March 20, 2009, Plaintiff was placed on a performance

---

[3]After the redistribution, Robinson, Sloggy, Christou, and Boutwell each had a net loss of one sales territory.  (Pla. depo. p. 284-86; Pla. depo. Ex. 29).  Plaintiff did not sustain a net loss of sales territories after the redistribution.  (Pla. depo. p. 284-86; Pla. depo. Ex. 29).

improvement plan ("PIP") due to unacceptable sales performance.  (Pla. depo. p. 183, 192; Pla. depo. Ex. 116).  Plaintiff had only made about $16,700 in sales to new customers in 2009.[4]  (Pla. depo. p. 185, 280-81).

Plaintiff was informed that he was being placed on the PIP by Whigham, Harris, and Huminski via a conference call.  (Pla. depo. p. 187-88).  Whigham stated in his deposition that Harris made the decision to put Plaintiff on the PIP, and Charles Daye of Human Resources and Whigham were also involved in that decision.  (Whigham depo p. 15-16, 31).

Pursuant to the PIP, Plaintiff had to make $100,000 in sales to new customers by June 30, 2009.[5]  (Pla. depo. p. 186, 195; Pla. depo. Ex. 116).  Additionally, Plaintiff was supposed to make a certain numbers of sales calls per day and have weekly meetings to discuss his progress under the PIP.  The terms of the PIP stated that if Plaintiff  failed to correct his unacceptable sales performance, he could be terminated.  (Pla. depo. Ex. 116).

Plaintiff objected to the PIP because Defendant was experiencing "an unprecedented economic time of challenge."  (Pla. depo. p. 188-89).  Additionally, when Plaintiff was hired, his former supervisor, Steve Kessler, had told Plaintiff that Plaintiff was not expected to meet a sales quota for twelve to fifteen months, because of the long sales cycle and the fact that the main buying season is from March though August/September.  (Pla. depo. p. 189).  Further, Plaintiff objected because he had been sharing his sales territory with Edwards during 2009 and was not able to sell the higher grossing products.  (Pla. depo. p. 189-90).

---

[4]While the PIP states that Plaintiff had only made $8,660 in new sales in 2009, Plaintiff states that this was an error, and he had actually made $16,700 in new sales.  (Pla. depo. p. 185).

[5]While the PIP states that Plaintiff needed to make $116,000 in new sales, Plaintiff states that this was an error that was adjusted to $100,000.  (Pla. depo. p. 186).

Soon after Plaintiff was put on the PIP, Whigham went out on leave and Plaintiff never went back to reporting to Whigham.  As a result, Plaintiff began having his weekly PIP meetings with Harris and Daye.  (Pla. depo. p. 176, 179).  After a few weeks, Plaintiff began reporting to David Wirta, and Plaintiff began having his weekly PIP meetings with Wirta.  (Pla. depo. p. 177-78).

On March 27, 2009, the sales quota for each MAR was reduced from $1 million to $700,000.  (Pla. depo. p. 117-18).  Pursuant to the PIP, Plaintiff needed to have a total of $116,700 in sales to new customers by June 30th (i.e., for the first six months of the year),[6] despite the fact that his quota for the entire year was $700,000.  (Pla. depo. p. 195-96).  Plaintiff, however, failed to make any sales to new customers during the PIP, despite the fact that he no longer shared his sales territory with anyone and despite the fact that he was on the PIP during the prime buying season.  (Pla. depo. p. 186, 220, 281).  Also, on May 7, 2009, while Plaintiff was on the PIP, Defendant received a complaint from one of Plaintiff's customers about the poor service that Plaintiff was providing.  (Pla. depo. p. 222; Pla. depo. Ex. 117).

Prior to the expiration of his PIP, Plaintiff requested FMLA leave to spend time with his daughter that was born on July 17th of the prior year.  (Pla. depo. p. 127).  Defendant granted Plaintiff FMLA leave through July 15 or 16, 2009.  (Pla. depo. p. 127).  On July 21, 2009, after Plaintiff returned from his FMLA leave, Daye informed Plaintiff that he was terminated.  (Pla. depo. p. 128-29).

Plaintiff contends that there is a disputed issue of fact regarding who made the decision

---

[6]Plaintiff had made $16,700 in sales to new customers in 2009 prior to the PIP, and he needed to make an additional $100,000 in sales during the PIP, for a total of $116,700 by June 30, 2009.  (Pla. depo. p. 195).

to terminate his employment.  In his deposition testimony, Plaintiff stated that certain documents led him to believe that Harris also played a role in the decision to terminate him.  (Pla. depo. p. 182).  The Court requested Plaintiff to file a sur-reply on this issue, to be more specific as to why he believed that Harris was involved in the decision to terminate him, and to identify any evidence that provides a basis for his belief in Harris' involvement.  (Doc. No. 26).  In response, Plaintiff contends that both Daye and Harris were involved in the decision to terminate him, because: (1) Harris and Daye were involved in the decision to place Plaintiff on the PIP; (2) Daye participated in some of the weekly PIP meetings; (3) Harris instructed Wirta on how to handle the weekly PIP meetings; and (4) Daye informed Plaintiff of his termination.[7]  Thus, Plaintiff contends that a reasonable jury could conclude that Daye and Harris were involved in the decision to terminate him and that they did so in retaliation for his complaint about Whigham's alleged race discrimination and/or in retaliation for him taking FMLA leave.

Wirta, on the other hand, states in a declaration submitted to the Court that he made the decision to terminate Plaintiff's employment.  (Doc. No. 28-2).  As further evidence that it was his decision, Wirta submitted an email chain documenting that on June 15, 2009, Wirta sent an email to Daye, in which Wirta stated that he did not feel that Plaintiff was "positioned to be successful" and that he intended to terminate Plaintiff if Plaintiff did not meet the terms of the PIP on June 30th.  (Doc. No. 28-2).

Based on the above, the only evidence before the Court regarding who made the decision

---

[7]Plaintiff asserts a fifth basis for his belief that Daye was involved in the decision to terminate him—because Daye had the authority to, and did in fact, reprimanded Whigham. Plaintiff, however, does not explain why that means that Daye was, in fact, involved in the decision to terminate Plaintiff.  Instead, at best, this shows that Daye may have had the authority to terminate Plaintiff.

to terminate Plaintiff's employment is that the termination decision was made by Wirta.  The Court notes that Plaintiff, in his deposition, stated that Daye told him that it was Wirta's decision to terminate him.  (Pla. depo. p. 175-76).  Furthermore, at his deposition, Plaintiff was asked if he had any reason to doubt that Wirta made the decision to terminate his employment, and Plaintiff responded, "No."  (Pla. depo. p. 225).  The fact that Daye and Harris were involved in other decisions does not provide a basis for finding a factual dispute regarding whether Wirta made the decision to terminate Plaintiff.  Wirta's testimony and emails are evidence that Wirta made the decision to terminate Plaintiff's employment, and no other *evidence* exists to conflict with that conclusion.

With regard to the proffered reason for Wirta's decision to terminate Plaintiff, Wirta has stated the following:

> [Plaintiff] made virtually no new sales in 2008, was at less than 8% of his reduced 2009 quota after almost six months;[8] and had not made a single sale during the approximately three months he was reporting to me.  During nine weekly meetings with [Plaintiff] he was consistently unprepared, unable to provide specifics on what he was doing or intended to do to generate new sales; and was often defensive, argumentative and even insubordinate. His weekly reporting simply listed the same potential deals with no progress or specifics on what he had done or was going to do to move the deal forward. I also received a written complaint from a customer echoing similar concerns about [Plaintiff] being unresponsive and not following through with his obligations. Finally, I personally participated in a customer call with [Plaintiff] and again found him unprepared and ineffective.

(Doc. No. 28-2).

---

[8]The discrepancy between Plaintiff's statement that he had met 16% of his quota by March of 2009 and Wirta's statement that Plaintiff was at less than 8% of his quota by July 2009 is explained by the fact that the percentage-to-quota amount is calculated by prorating the total quota amount based on the number of months that have passed. (Pla. depo. p. 122).  Because Plaintiff did not make any additional sales after March 2009, his percentage-to-quota of sales decreased. (Pla. depo. p. 122).

Thereafter, Plaintiff filed this lawsuit against Defendant, in which he asserts three claims. (Doc. No. 1).  First, he asserts a claim of race discrimination under § 1981, in which he contends that he was subjected to disparate treatment and was terminated based on his race.  However, in his deposition, Plaintiff stated that the only person whose actions were racially motivated was Whigham.  (Pla. depo. p. 225-26, 247).  Since it is undisputed that Whigham was not involved in the decision to terminate Plaintiff's employment, Plaintiff's race discrimination claim based on his termination fails.  As such, the Court will analyze his race discrimination claim with respect to the decision to split his sales territory with Edwards and with respect to the decision to place Plaintiff on a PIP.

Second, Plaintiff asserts a claim of retaliation under § 1981.  The Court construes this claim as being based on the decision to place Plaintiff on a PIP and then to terminate his employment after he complained to Human Resources about Whigham's alleged racial discrimination.

Third, Plaintiff asserts claims of FMLA interference and retaliation.  The Court construes these claims as being based on the decision to terminate Plaintiff's employment after he took FMLA leave.

### III.  Motion for Summary Judgment

Defendant moves for summary judgment on all of Plaintiff's claims.  Accordingly, the Court will analyze each of Plaintiff's claims.

#### A.  Race Discrimination

Plaintiff asserts a claim of race discrimination under § 1981, in which he contends that he was subjected to disparate treatment because of his race.  The Eleventh Circuit has stated the

9

following with regards to the analytical framework for evaluating a race discrimination claim:[9]

> When reviewing discrimination claims that are supported by circumstantial evidence, [courts] employ the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green.  Under this analysis, a plaintiff is initially required to establish a *prima facie* case of discrimination.  Assuming that [the plaintiff] is able to do so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason(s) for the adverse employment action. If the employer does this, the plaintiff, whose burden it is to prove the discrimination . . . alleged, must establish that the employer's articulated reason(s) is merely a pretext for discrimination. . . .

> Pretext means that the reasons given by the employer were not the real reasons for the adverse employment decision. A reason cannot be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it head on and rebut it.

> A plaintiff will withstand summary judgment by demonstrating that a reasonable factfinder could find unworthy of credence the weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.  In deciding whether a plaintiff has made such a showing, however, [courts] must bear in mind that [courts] do not sit as a "super personnel department." [Courts] will not second-guess the business judgment of the employer; indeed, [courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [our] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.  As such, the inquiry into whether an employer's proffered reasons amounted to a pretext for discrimination centers on the employer's beliefs, not the beliefs of the employee, or even objective reality.

Patrick v. Bishop State Community College, 470 Fed. Appx. 797, 799-800 (11th Cir. April 24, 2012)(internal citations and quotation marks omitted).

Normally, in order to establish a prima facie case of race discrimination, a plaintiff must show: (1) that he or she is a member of a racial minority; (2) that he or she was subjected to an

---

[9]The same analytical framework applies to claims under § 1981 and Title VII.  See Patrick v. Bishop State Community College, 470 Fed. Appx. 797, 799 (11th Cir. 2012); Gant v. Kash 'n Karry Food Stores, Inc., 390 Fed. Appx. 943, 945 (11th Cir. 2010)(citations omitted).

adverse employment action; (3) that the defendant treated similarly situated employees outside of the plaintiff's race more favorably; and (4) that the plaintiff was qualified for his or her job. See Beal v. Convergys Corp., 2012 WL 4052312, at *1 (11th Cir. Sept. 14, 2012)(citation omitted). It is undisputed that Plaintiff is a member of a racial minority. Further, Plaintiff's race discrimination claim is based on the following two employment actions: (1) Whigham's decision to split his sales territory with Edwards in early 2009, and (2) the decision to place Plaintiff on a PIP. Accordingly, the Court will analyze this claim with respect to each employment action.

### 1.  Splitting Plaintiff's Sales Territory

Plaintiff's race discrimination claim is based, in part, on Whigham's decision to split Plaintiff's sales territory with Edwards in early 2009. Defendant moves for summary judgment, arguing that Plaintiff cannot state a prima facie case because Plaintiff cannot point to any similarly situated comparators and because the splitting of his sales territory was not an adverse employment action.

The Court rejects Defendant's argument that the splitting of Plaintiff's sales territory was not an adverse employment action, because Plaintiff's compensation structure included a commission for the sales that he made. After the split, Plaintiff had to share his sales territory and could not sell Defendant's higher grossing products. Thus, the splitting of his sales territory could have an adverse impact on his compensation. See Berman v. Orkin Exterminating Co., Inc., 160 F.3d 697, 702 (11th Cir. 1999)(noting that the involuntary transfer of a salesman that resulted in a reduction in sales territory could constitute an adverse employment action).

The Court also rejects Defendant's argument that the failure to identify a similarly situated comparator is automatically fatal to Plaintiff's claim. In certain circumstances, the

failure to identify a similarly situated comparator is not fatal, such as when there is non-comparison circumstantial evidence of discrimination.  See Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012)(citations omitted).

Assuming that Plaintiff can state a prima facie case of race discrimination based on Whigham's decision to split Plaintiff's sales territory with Edwards, the inquiry does not end there.  Defendant also proffers two legitimate, non-discriminatory reasons for splitting Plaintiff's sales territory: (1) Defendant needed to have someone else beginning to become familiar with Plaintiff's sales territory, because Plaintiff was underperforming; and (2) Edwards was put in Plaintiff's sales territory to help Plaintiff, because Edwards had been with Defendant for ten years and was one of the MARs with the most knowledge and experience.  Given these explanations for splitting Plaintiff's sales territory, Plaintiff must show that these reasons are merely a pretext for discrimination.

As previously stated: "A reason cannot be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it head on and rebut it."  Patrick, 470 Fed. Appx. at 800 (citations and quotation marks omitted).

Plaintiff does not dispute that prior to the sales territory split in January of 2009, he achieved only 1.04% of his prorated 2008 quota for sales to new customers.  Thus, Defendant's proffered reasons are ones that might motivate a reasonable employer, and Plaintiff must meet the reasons head on and rebut them.  Plaintiff has not done so, and as such, Defendant is entitled to summary judgment on Plaintiff's race discrimination claim to the extent that it is based on

Whigham's decision to split Plaintiff's sales territory with Edwards.

### 2.  Placing Plaintiff on a PIP

Plaintiff's race discrimination claim is also based, in part, on the decision to place Plaintiff on a PIP in March of 2009.  Defendant moves for summary judgment, arguing that Plaintiff cannot state a prima facie case because putting Plaintiff on a PIP was not an adverse employment action.[10]  The Court agrees.  See Jarvis v. Siemens Medical Solutions USA, Inc., 460 Fed. Appx. 851, 858 (11th Cir. Mar. 8, 2012)(concluding that placing the plaintiff on a PIP was not a materially adverse action because it did not limit his employment opportunities within the company)[11]; Brown v. Sybase, Inc., 287 F. Supp.2d 1330, 1342 (S.D. Fla. 2003).

In Brown, the plaintiff, Brown, was placed on a PIP because he was under-performing as a regional sales manager.  See id. at 1337.  In his PIP, Brown was warned that if he failed to meet the requirements of the PIP, he would be terminated.  See id.  Brown did not meet the requirements of the PIP and was terminated.  See id. at 1338.  Brown asserted a race discrimination claim based, in part, on his placement on the PIP.  See id. at 1341.  In concluding

---

[10]Defendant also argues that Plaintiff cannot state a prima facie case because he cannot point to any similarly situated comparators.  However, the Court has already addressed this argument with respect to the decision to split Plaintiff's sales territory and will not address it again.

[11]In Jarvis, the court was evaluating whether the placement of the plaintiff on a PIP was a "materially adverse action" sufficient to support his Title VII retaliation claim.  See Jarvis, 460 Fed. Appx. at 858.  A "materially adverse action" encompasses a broader category of actions than the term, "adverse employment action."  Crawford v. Carroll, 529 F.3d 961, 973-74 (11th Cir. 2008).  The Supreme Court changed the type of actionable conduct for Title VII retaliation claims from the more limited category of "adverse employment actions" to the broader category of "materially adverse actions."  See id. (citing Burlington Northern & Sante Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006)).

that Brown's placement on the PIP was not an adverse employment action, the court stated:

> [T]he Eleventh Circuit has held that an alteration in work responsibilities does not amount to adverse employment action when unaccompanied by tangible harm. Although Brown's placement on a PIP increased Brown's responsibilities and altered Brown's pipeline requirements, the change was unaccompanied by any tangible harm, such as a decrease in salary or a change in job title or classification. Moreover, because his PIP was intended to assist Brown, the Court does not find that Brown's placement on a PIP was objectively adverse to Brown's employment. For these reasons, the Court finds that there is insufficient evidence from which it can be reasonably inferred that Brown's placement on the PIP constitutes an adverse employment action.

Id. at 1342 (internal citations and quotation marks omitted).

Accordingly, this Court concludes that Plaintiff's placement on the PIP was not an adverse employment action that can support his race discrimination claim. However, even if his placement on the PIP could be considered an adverse employment action and even if he could establish a prima facie case, his claim would still fail.[12]

Defendant proffers the following as a legitimate, non-discriminatory reason for placing Plaintiff on the PIP on March 20, 2009: Plaintiff had an unacceptable sales performance. Plaintiff achieved only 1.04% of his prorated 2008 quota for sales to new customers and had only made about $16,700 in sales to new customers in 2009.

Even though Plaintiff contends that he reached 16% of his sales quota prior to his placement on the PIP, Defendant's determination that such performance was unacceptable is a determination that a reasonable employer might make and which might motivate a reasonable

---

[12]The Court notes that an additional hurdle that Plaintiff would have to overcome in order to state a prima facie case is racial animus of the decision-maker. The evidence shows that the decision to place Plaintiff on the PIP was made by three people—Whigham, Harris, and Daye—and Plaintiff does not contend that Harris or Daye had a racially discriminatory animus towards him.

employer to place an employee on a PIP.  Because Defendant has proffered a legitimate, non-

discriminatory reason, Plaintiff must show that the reason is pretextual.  To the extent that

Plaintiff attempts to do so by arguing that he was third among the eight MARs in meeting his

sales quota, Plaintiff has not provided any information regarding the specific MARs who had

lesser sales at the time that he was placed on the PIP.  Plaintiff does not identify which MARs

had lesser sales, what percentage of sales that they had, and/or how long those MARs had been

employed by Defendant.[13]  As such, the fact that Plaintiff was third among the eight MARs in

meeting his sales quota prior to being placed on the PIP, in itself, is not sufficient to show

pretext.

Plaintiff also argues that his placement on the PIP was unfair because: (1) Defendant was

experiencing "an unprecedented economic time of challenge;" (2) his former supervisor had told

Plaintiff that Plaintiff was not expected to meet a sales quota for twelve to fifteen months,

because of the long sales cycle and the fact that the main buying season is from March though

August/September; and (3) he had been sharing his sales territory with Edwards during 2009 and

was not able to sell the higher grossing products.  While these arguments may show that the

decision to place Plaintiff on a PIP was unfair, unfairness is not sufficient to show pretext.  As

previously stated:

> In deciding whether a plaintiff has made . . . a showing [of pretext], however,
> [courts] must bear in mind that [courts] do not sit as a "super personnel

---

[13]For example, Christou, Moran, Boutwell, and Ardvison might not be proper
comparators, as they did not become MARs until several months after Plaintiff was hired, and
thus, Plaintiff had more time to gain experience selling Defendant's products. Christou was hired
in October of 2008, Moran was hired in November of 2008, and both Boutwell and Ardvison
became MARs in mid-January of 2009. (Pla. depo. p. 112, 116).  Plaintiff, on the other hand,
became a MAR on April 28, 2008.

> department." [Courts] will not second-guess the business judgment of the
> employer; indeed, [courts] are not in the business of adjudging whether
> employment decisions are prudent or fair. Instead, [our] sole concern is whether
> unlawful discriminatory animus motivates a challenged employment decision.  As
> such, the inquiry into whether an employer's proffered reasons amounted to a
> pretext for discrimination centers on the employer's beliefs, not the beliefs of the
> employee, or even objective reality.

Patrick, 470 Fed. Appx. at 800 (internal citations and quotation marks omitted).

Accordingly, the Court concludes that Defendant is entitled to summary judgment on this

claim, because the PIP was not an adverse employment action, and even if it was, Plaintiff has

not shown that Defendant's proffered reason for the PIP was pretextual.

**B.  Retaliation**

Next, Plaintiff asserts a claim of retaliation under § 1981.  Specifically, he alleges that

Defendant retaliated against him after he complained to Human Resources about Whigham's

alleged discriminatory actions.

In order to establish a prima facie case of retaliation, a plaintiff must show three things:

(1) that he or she participated in a protected activity; (2) that the defendant subjected the plaintiff

to an act that would have been materially adverse to a reasonable employee; and (3) a causal

connection between the protected activity and the materially adverse action.  See Gant v. Kash 'n

Karry Food Stores, Inc., 390 Fed. Appx. 943, 945 (11th Cir. 2010)(citations omitted).  If the

plaintiff makes such a showing, the defendant must come forward with a legitimate, non-

retaliatory reason for the materially adverse action.  See id. (citation omitted).  If the defendant

proffers a legitimate, non-retaliatory reason, then the plaintiff must show that the defendant's

proffered reason is pretextual.  See id. (citation omitted).

As a basis for this claim, Plaintiff argues that Defendant retaliated against him after he

complained to Human Resources in January of 2009 about Whigham's alleged discriminatory actions, and the retaliation consisted of placing Plaintiff on a PIP on March 20, 2009 and then terminating his employment in July of 2009.  Defendant argues that Plaintiff cannot establish any of the elements of a prima facie case.

The Court concludes that Plaintiff meets the first element—that he participated in a protected activity.  Plaintiff's complaint to Human Resources about Whigham's alleged discriminatory actions satisfies this element.  With respect to the remaining elements, the Court will evaluate each basis for the retaliation claim.

### 1.  Placing Plaintiff on the PIP

The first basis for the retaliation claim is the placement of Plaintiff on the PIP on March 20, 2009.  However, the Court agrees with Defendant that Plaintiff cannot base his retaliation claim on the PIP, because the PIP is not a materially adverse action.  See Jarvis, 460 Fed. Appx. at 858 (concluding that placing the plaintiff on a PIP was not a materially adverse action because it did not limit his employment opportunities within the company).

"An action is 'materially adverse' if it might dissuade 'a reasonable worker from making or supporting a charge of discrimination.'"  See Stokes v. Alfa Mutual Ins. Co., 2011 WL 5434245, at *2 (M.D. Ala. Nov. 9, 2011)(quoting Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53, 67 (2006)).  Plaintiff has not shown that the PIP was in any way adverse. The PIP required that Plaintiff make an additional $100,000 in sales to new customers, for a total of $116,700, by June 30, 2009.  Given that Plaintiff's sales quota for the entire year was $700,000, the PIP cannot be described as being materially adverse.  Likewise, the fact that Plaintiff had to go to weekly PIP meetings to discuss his progress and had to make a certain

number of sales calls each day cannot be described as materially adverse.  Accordingly, the

Court concludes that Plaintiff cannot base his retaliation claim on the PIP, because the PIP is not

a materially adverse action, and as such, he cannot establish a prima facie case of retaliation

based on the PIP.

Even if the Court concluded that the PIP was a materially adverse action and that

Plaintiff could establish a prima facie case, his claim would still fail because Defendant has

proffered a legitimate, non-retaliatory reason for placing Plaintiff on the PIP—Plaintiff had an

unacceptable sales performance.  Thus, for the same reasons as explained above with respect to

the PIP and Plaintiff's race discrimination claim, Plaintiff's retaliation claim based on the PIP

fails due to Defendant's legitimate, non-retaliatory reason for placing Plaintiff on the PIP.

Accordingly, Defendant is entitled to summary judgment on the retaliation claim to the extent

that it is based on the placement of Plaintiff on the PIP.

### 2.  Plaintiff's Termination

The other basis for the retaliation claim is the termination of Plaintiff's employment in

July of 2009—more than six months after he complained to Human Resources about Whigham's

alleged discriminatory actions.  While termination of employment is a materially adverse

employment action, Defendant argues that there is not a causal connection between his

complaint and his termination more than six months later.  Defendant cites to several cases to

support its argument that a span of six months between the protected activity and the adverse

action is too long to support a finding of a causal connection.

However, the Court need not determine whether Plaintiff has shown a casual connection,

because even assuming that Plaintiff can establish a prima facie case of retaliatory discharge,

Defendant has offered a legitimate, non-retaliatory reason for terminating his employment—Plaintiff made no sales while he was placed on the PIP and was warned that the failure to make $100,000 in sales to new customers could lead to termination of his employment. Plaintiff does not dispute that he did not make any sales during this period.

Furthermore, Wirta has provided additional legitimate, non-retaliatory reasons for Plaintiff's termination:

> During nine weekly meetings with [Plaintiff] he was consistently unprepared, unable to provide specifics on what he was doing or intended to do to generate new sales; and was often defensive, argumentative and even insubordinate. His weekly reporting simply listed the same potential deals with no progress or specifics on what he had done or was going to do to move the deal forward. I also received a written complaint from a customer echoing similar concerns about [Plaintiff] being unresponsive and not following through with his obligations. Finally, I personally participated in a customer call with [Plaintiff] and again found him unprepared and ineffective

(Doc. No. 28-2).

Plaintiff, however, has not shown that Defendant's proffered reasons are mere pretext for retaliation.  Plaintiff was hired to sell Defendant's products, and he was terminated due to his failure adequately perform this task.  Clearly, Defendant's proffered reasons for Plaintiff's termination are ones that might motivate a reasonable employer, and Plaintiff has not rebutted them.  Accordingly, the Court concludes that Plaintiff's retaliation claim based on his termination fails due to Defendant's legitimate, non-retaliatory reasons for his termination.  As such, Defendant is entitled to summary judgment on the retaliation claim to the extent that it is based on Plaintiff's termination.

### C.  FMLA Interference and Retaliation

Next, Plaintiff asserts claims of FMLA interference and retaliation.  As a basis for these

claims, he points to the fact that he was terminated after he took FMLA leave through July 15 or

16, 2009.  Accordingly, the Court will address each FMLA claim.

### 1.  FMLA Interference

In order to establish a claim for FMLA interference, the employee must show that he or

she was entitled to FMLA leave and was denied that benefit.  See Crawford v. City of Tampa,

464 Fed. Appx. 856, 858 (11th Cir. 2012)(citation omitted).  It appears that Plaintiff is asserting

that Defendant interfered with Plaintiff taking FMLA leave by terminating his employment on

July 10, 2009 while he was still on FMLA leave.  Thus, the parties dispute whether Plaintiff was

terminated on July 20, 2009 (after the FMLA leave) or on July 10, 2009 (during the FMLA

leave).

Plaintiff contends that on July 10, 2009, while he was on FMLA leave, he was told not to

contact customers and that he later received paperwork from Defendant that indicated that he

was terminated on July 10, 2012.  (Pla. depo. p. 137; Doc. No. 29-1, p. 1).  Defendant responds

that the July 10, 2009 termination date on the paperwork was a temporary error in recording the

date of Plaintiff's termination on paperwork sent to him.  (Doc. No. 28-1).  Defendant supports

this contention by submitting an email chain to the Court in which Plaintiff emailed Daye on

August 7, 2009 and stated that Daye had previously advised him that his termination date was

July 20, 2009, but that he received paperwork indicating that his termination date was July 10,

2009.  (Doc. No. 28-1).  The email chain also shows Daye's August 9, 2009 response to Plaintiff,

in which Daye confirms to Plaintiff that his termination date was, in fact, July 20, 2009.  (Doc.

No. 28-1).

Regardless of the date on the paperwork that Plaintiff received, Plaintiff has not alleged

that he was not given all of the leave to which he was entitled.  (Pla. depo. p. 132, 135).  At times

during his deposition Plaintiff made conflicting statements regarding how Defendant interfered

with his FMLA leave, but it appears that Plaintiff mainly takes issue with the fact that the

decision to terminate his employment was made while he was on FMLA leave, and as such, he

did not have a job after he returned from his FMLA leave.  (Pla. depo. p. 132-37).  However, the

fact that Defendant decided to terminate Plaintiff while he was on FMLA leave does not save

Plaintiff's claim, because Defendant's reason for terminating Plaintiff (i.e., his lack of sales) was

not related to his taking FMLA leave, and Plaintiff has not shown that Defendant's proffered

reason was mere pretext.  See Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1241 (11th

Cir. 2010).  Furthermore, Plaintiff failed to specifically identify an actual FMLA benefit that he

was denied, and when asked whether he knew whether he was paid everything, he responded, "I

don't."  (Pla. depo. p. 132-137).  Therefore, because Plaintiff has not pointed to any specific

evidence of any FMLA benefit that he was denied, nor has he shown that Defendant's proffered

reason was mere pretext, his FMLA interference clam fails.  As such, Defendant is entitled to

summary judgment on this claim.

### 2. FMLA Retaliation

In order to establish a retaliation claim under the FMLA, a plaintiff must show that the

defendant intentionally discriminated against him or her in the form of taking an adverse

employment action against the plaintiff for exercising an FMLA right.  See Diehl v. Bank of

America, N.A., 470 Fed. Appx. 771, 776 (11th Cir. 2012)(citation omitted).  Thus, like Plaintiff's

§ 1981 claims, the burden shifting analysis described above applies.  See Morgan v. Orange

County, Fla., 477 Fed. Appx. 625, 628 (11th Cir. 2012).

Plaintiff contends that he was terminated because he took FMLA leave.  As previously explained with respect to Plaintiff's § 1981 retaliation claim, however, Defendant has proffered legitimate, non-retaliatory reasons for Plaintiff's termination, which Plaintiff has failed to rebut. As such, Plaintiff's FMLA retaliation claim necessarily fails, and Defendant is entitled to summary judgment on this claim.

**IV.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 17) is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 7th day of November, 2012.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record